**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., et al.,[1] | ) Case No. 15-01145 (ABG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., et al., | ) Chapter 11 |
| | ) Adversary Case No. _____ |
| *Plaintiffs* | ) |
| vs. | ) |
| THE BOARD OF TRUSTEES OF THE NATIONAL RETIREMENT FUND and THE PENSION PLAN OF THE NATIONAL RETIREMENT FUND | ) |
| *Defendants* | ) |

**ADVERSARY COMPLAINT FOR DECLARATORY RELIEF**

Plaintiffs bring this Complaint against Defendants the Pension Plan of the National Retirement Fund and the Board of Trustees of the National Retirement Fund (the "NRF"). As grounds for their Complaint, Plaintiffs respectfully state as follows:

**Nature of the Action**

1. Following the filing of an involuntary bankruptcy petition by certain senior secured creditors against Caesars Entertainment Operating Company ("CEOC") on

---

[1] A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/CEOC. The Debtors are collectively Plaintiffs in this matter.

January 12, 2015, on the very same day, Defendants purported to expel the Employers (as defined herein),[2] three of which are Debtors, from the NRF (the "Expulsion"). Defendants' purported Expulsion of the Employers came notwithstanding Plaintiffs' established history of making timely payments to the Pension Fund and despite Plaintiffs' expressed intention to continue making such contributions indefinitely. Defendants' conduct violated the automatic stay created by 11 U.S.C. § 362(a).

2.  On February 13, 2015, the NRF sent certain non-debtor affiliates of the Plaintiffs a notice of payment demand (the "Interim Payments Demand") of a substantial withdrawal liability created by the purported Expulsion. This notice seeks to impose upon these non-debtor affiliates the obligation to make hundreds of millions of dollars in interim payments beginning on March 15, 2015. It also starts a clock under which the non-debtor affiliates must initiate arbitration challenging any action with respect to the determination or computation of their alleged withdrawal liability, because if they do not do so, they will waive forever the right to challenge that computation.[3]

3.  Though Defendants cagily sent their Interim Payments Demand only to Plaintiffs' non-debtor affiliates, the effect is as if the demand had been sent to Plaintiffs themselves. This is so because the Employee Retirement Income Security Act of 1974, as amended ("ERISA") deems the Plaintiffs and their non-debtor affiliates a single "controlled group" for purposes of the act and any withdrawal liability thereunder. Notice to any one member is notice to all. The obligation to make interim payments of one member is the obligation of all. Further, the failure

---

[2] Bally's Park Place, Inc. d/b/a Bally's Hotel and Casino; Boardwalk Regency Corporation d/b/a Caesars Atlantic City; Chester Downs & Marina, LLC d/b/a Harrah's Philadelphia; Parball Corporation; Harrah's Operating Company, Inc. d/b/a Harrah's Atlantic City Casino & Hotel.

[3] Concurrently herewith, the Plaintiffs have filed a motion seeking an extension of the automatic stay to enjoin the Defendants from expelling the Controlled Group and from demanding withdrawal payment liability on March 15, 2015.

to timely initiate arbitration challenging the amount of those payments is a failure that would bind all members of the controlled group as well. In short, though the Interim Payment Demand was ostensibly sent to non-debtors, there is legal effect of it on the Plaintiffs, and thus constitutes a violation of the automatic stay.

4. Plaintiffs bring this complaint against the NRF and the NRF Trustees pursuant to Fed. R. Bankr. P. 7001 for the following relief:

    a. A declaration by this Court that the Defendants' demand of interim withdrawal payments is void as a violation of the automatic stay under 11 U.S.C. § 362.

    b. In the alternative, a declaration that the Defendants' demand of interim withdrawal payments is invalid as to the Plaintiffs and does not apply to and cannot bind Plaintiffs or any other debtors to make any interim withdrawal payments or institute arbitration proceedings pursuant to ERISA in order to preserve the right to challenge the purported Expulsion and withdrawal liability.

**Parties**

5. Plaintiff CEOC is a Delaware corporation with its principal executive office located at One Caesars Palace Dr. Las Vegas, Nevada 89109.

6. A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/CEOC.

7. CEOC owns 100% of several relevant Debtors: Bally's Park Place, Inc. d/b/a Bally's Hotel and Casino ("Bally's AC"), Boardwalk Regency Corporation d/b/a Caesars Atlantic City ("Caesars AC"), and Parball Corporation ("Las Vegas Laundry"). CEOC also owns 99.5% of Chester Downs Marina LLC d/b/a Harrah's Philadelphia ("Harrah's Chester"). Each of these entities is an employer party to collective bargaining agreements ("CBAs") with

3

UNITE HERE Local 54 ("Local 54") that obligate them to make pension contributions to the NRF.

8. Non-party Caesars Entertainment Corporation ("CEC") (CEOC's parent) owns Caesars Entertainment Resort Properties, LLC ("CERP") which in turns owns 100% of Harrah's Operating Company, Inc., d/b/a Harrah's Atlantic City Casino and Hotel ("Harrah's AC"). Harrah's AC is party to a CBA with Local 54 that requires it to make contributions to NRF. All of the aforementioned entities are part of the same controlled group of employers (the "Caesars Controlled Group") for purposes of the Internal Revenue Code, as amended (the "IRC") and ERISA.

9. Defendant NRF is a multiemployer pension plan within the meaning of ERISA § 3(37) and 4001(a)(3), 29 U.S.C. §§ 3(37) and 1301(a)(3). The NRF maintains its principal office and administers the plan at 333 Westchester Avenue, White Plains, New York.

10. The NRF Trustees maintain its principal office at 333 Westchester Avenue, White Plains, New York.

## Jurisdiction

11. This Court has jurisdiction pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334.

12. This adversary proceeding constitutes a core proceeding within the meaning of one or more subsections of 28 U.S.C. § 157(b).

13. Venue is proper in this district pursuant to 28 U.S.C. § 1409 on account of CEOC's bankruptcy case under chapter 11 of title 11 of the United States Code.

## Factual Allegations

### I. Plaintiffs are Subject to Collective Bargaining Agreements that Obligate them to Make Payments to the NRF.

14. CEOC is the largest majority-owned operating subsidiary of Caesars Entertainment Corporation ("CEC"). CEC, together with its affiliates (collectively "Caesars"), is the world's most geographically diversified casino-entertainment company. Since its founding in Nevada more than 75 years ago, Caesars has grown through new development, expansions, and acquisitions. Caesars now owns, operates or manages 50 casinos in five countries on three continents, with properties in the United States, Canada, the United Kingdom, South Africa, and Egypt.

15. Several Plaintiffs (subsidiaries of CEOC) are parties to CBAs that obligate them to make payments to the NRF. The Defendants are the NRF Trustees and the NRF, a multiemployer defined benefit pension plan. The NRF is responsible for maintaining the pension plan that pays the pensions of certain employees of Caesars, members of UNITE HERE Local 54 and the Culinary Workers Union, Local 226. The NRF is governed by a the NRF Trustees composed of union representatives and employer representatives.

16. The Employers have consistently and timely made contributions to the NRF in accordance with both (a) the requirements set forth in all CBAs to which they are parties and (b) the terms of the NRF Trust Agreement (including any participating employer agreement between CEC, CEOC, CERP and NRF). They have not expressed a desire to withdraw from the NRF, nor have they made any representations that they have an intention of withdrawing from the NRF, ceasing payments to the NRF, or otherwise changing their relationship to the NRF.

## II. CEOC Enters Into A Restructuring Support Agreement.

17. On December 19, 2014, CEOC and CEC entered into a Restructuring Support and Forbearance Agreement ("RSA") with certain of CEOC's senior secured creditors. The RSA does not contemplate in any way affecting CEOC's obligations to make payments to the NRF. CEOC, CEC, CERP, and their subsidiaries subject to CBAs with payment obligations to the NRF intend to continue to make contributions to the NRF in the normal course of business.

## III. Expulsion from the NRF and the CEOC Involuntary Petition.

18. In December 2014, the NRF threatened CEC, CEOC, CERP and the other members of the Controlled Group with expulsion. The NRF, CEC, CEOC and CERP entered into a Standstill Agreement on December 21, 2014. None of Bally's AC, Caesar's AC, Harrah's Chester, Las Vegas Laundry, and Harrah's AC was a signatory to the Standstill Agreement. Under the Standstill Agreement, the NRF would agree not to attempt to expel any member of the Caesars Controlled Group, and the Caesars Controlled Group would, and not incur an Insolvency Event (as defined therein) without first giving the NRF five days' notice.

19. On Thursday, January 8, 2015, the Caesars Controlled Group gave notice that they were terminating the Standstill Agreement due to CEOC's and its subsidiaries impending voluntary chapter 11 cases, which they expected to commence on or after January 15, 2015. The same day, CEC filed a lawsuit in the United States District Court for the Southern District of New York contending that the NRF Trustees lacked the statutory or contractual power to unilaterally expel the Caesars Controlled Group from the NRF.

20. On Monday, January 12, 2015, three of CEOC's second lien noteholders filed an involuntary petition against CEOC under 11 U.S.C. § 303 in the United States Bankruptcy Court for the District of Delaware. Though CEOC contends that the petitioning creditors did not

6

satisfy the requirements of 11 U.S.C. § 303, the filing of the involuntary petition nevertheless triggered the automatic stay pursuant to 11 U.S.C. § 362(a).

21. That same day, even though they understood that taking any action directly or indirectly against CEOC would violate the automatic stay, the NRF Trustees engaged in what many of them have described as an "irregular, hastily-convened telephonic conference call." (See Compl. in Wilhelm, et al. v. Beasley, et al, Case No. 15-cv-00245, United States District Court for the District of Nevada ¶ 21.)[4] During this call, a majority of the NRF's trustees voted to expel the Employers (Bally's Atlantic City, Caesars Atlantic City, Harrah's Atlantic City, Harrah's Chester, and Las Vegas Laundry) from the NRF—both from the purported Legacy Plan and the purported Adjustable Plan. They did so having been fully informed of the fact that an involuntary bankruptcy petition had already been filed against CEOC and that as a result thereof the automatic stay went into effect. At 11:34 a.m. on January 12, 2015, counsel to CEC informed the NRF Trustees' counsel that an involuntary bankruptcy petition had been filed that same morning against CEOC. The NRF sent the expelled members the First Expulsion Notice later that same day to inform them of the purported Expulsion.

22. On the following day, January 13, 2015, the NRF Trustees sent a second Expulsion Notice (the day after the involuntary was filed and with full knowledge thereof and of the automatic stay) which purported to correct and supersede the first Expulsion Notice, and to expel the Employers from only part of the NRF (the Legacy Plan).

23. On January 15, 2015, the Plaintiffs and other affiliated entities filed voluntary bankruptcy petitions in the Northern District of Illinois, In re Caesars Entertainment Operating Company, Inc., et. al., Case No. 15-01145 (Bankr. N.D. Ill. 2015).

---

[4] A group of NRF Trustees filed an action for breach of fiduciary duty against those NRF Trustees voting to expel the Caesars Controlled Group.

**IV.     Notice of Withdrawal Liability.**

24.     An employer who ceases to have an obligation to contribute to a multi-employer pension plan is determined to have withdrawn from the multi-employer pension fund and must pay what is known under ERISA as "withdrawal liability" — which represents the amount necessary to pay a withdrawn employer's share of a given plan's unfunded vested benefits. The NRF Trustees' decision to expel the Employers from the NRF directly results in the Employers ceasing to have an obligation to contribute to the NRF, the further result of which is that the Expulsion of the Employers is treated as synonymous with a voluntary withdrawal of those entities from the NRF (despite the obviously involuntary nature of the Expulsion). On February 13, 2015, counsel for the NRF Trustees sent a notice to CEC and CERP (non-party non-debtor affiliates of the Plaintiffs) supplying notice and demand of payment for liability for withdrawal from the NRF due to a complete or partial withdrawal (as described in Section 4201(a) of ERISA). The notice estimated the Employer's withdrawal liability to be approximately $462,012,305.00, payable in 80 quarterly installments, with the first installment of $5,981,493 due and payable on March 15, 2015.

**V.     The ERISA and MPPAA Regime.**

25.     ERISA governs the law of employee benefit plans, including retirement and health and welfare plans. ERISA establishes certain rules and minimum standards regarding the provision of employee benefits, an employee's rights with respect to those benefits, and an employer's duties in funding and administering such benefits. Multiemployer pension plans are defined benefit plans maintained pursuant to one or more CBAs between more than one employer and one or more employee organizations (typically a union). ERISA §§ 3(37) and 4001(a)(3). A multiemployer plan is generally administered by a joint board of union trustees and employer-appointed trustees. Such plans are governed by ERISA, which also includes many

8

provisions of the IRC and the Multiemployer Pension Plan Amendments Act of 1980, as amended ("MPPAA").

26. MPPAA, which amended Title IV of ERISA, is intended to maintain the financial health of multiemployer plans and to prevent a "race to the exit" by imposing an exit penalty on employers in the form of "withdrawal liability" which represents an employer's share of the multiemployer plans' unfunded vested benefits (i.e., the difference between the value of the plan's assets and the present value of its vested benefit obligations to multiemployer plan participants). The MPPAA holds that all trades or businesses under common control with the withdrawing employer (the "Controlled Group") are jointly and severally liable for the withdrawal liability. 29 U.S.C. § 1301(b)(1).

27. Judgments for withdrawal liability can be collected from any Controlled Group member, even if the only other member was the target of a legal proceeding. Cent. States, Se. & Sw. Areas Pension Fund v. Rogers, 843 F. Supp. 1135, 1140 (E.D. Mich. 1992) aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Rogers, 14 F.3d 600 (6th Cir. 1993) ("Under the principles of joint and several liability, plan sponsors can sue one or more of the members of a common control group, and can collect the entire judgment from one or more of them.").

28. Similarly, notice and demand for the payment of withdrawal liability to one Controlled Group member is considered constructive notice to all members of the Controlled Group. See Trustees v. Central Transport, Inc., 888 F.2d 1161, 1163 (7th Cir.1989).

29. In order to dispute the assessment of withdrawal liability, a party must timely bring an arbitration pursuant to the provisions of 29 U.S.C. § 1401(a)(1). If the employer or any member of the Controlled Group fails to timely initiate an arbitration as required under ERISA, the withdrawal liability of the party becomes fixed and the amount assessed is due and owing

from whomever may later be found to be within the Controlled Group. Rogers, 843 F. Supp. 1135, 1140 (E.D. Mich. 1992).

30. Regardless of whether an employer challenges the assessment of withdrawal liability, the deadline to pay withdrawal liability is 60 days from the date of the plan sponsor's demand. 29 U.S.C. § 1399(c)(2). Such payment requirement is notwithstanding the institution of any arbitration proceedings by the "withdrawn" employer. Id.

### VI.    The NRF's Actions Imperil the RSA

31. On December 22, 2014, CEC and Caesars Acquisition Company ("CAC") entered into an agreement to merge in an all-stock transaction (the "Merger Agreement"). Among other things, this merger will provide CEC with sufficient cash to fund its obligations to the Debtors as contemplated by the RSA "without the need for any significant outside financing." Press Release, Caesars Entertainment, Caesars Acquisition Co. Agree to Merge (Dec. 22, 2014). Because of the hundreds of millions of dollars in withdrawal liability which the NRF is attempting to impose unlawfully by the Expulsion, CEC will have less cash to fund its obligations in CEOC's restructuring, and CEC's merger with CAC could therefore be negatively impacted by increasing the cost to CEC, both of which could adversely affect the ultimate success of the Debtors' restructuring.

### Claims for Relief

### Count I

### Declaratory Judgment — Payment Demand Violated the Automatic Stay

32. Plaintiffs repeat and incorporate the allegations contained in paragraphs 1–31 as though fully set forth herein.

33. The involuntary petition triggered the automatic stay on January 12, 2015.

34. The Debtors' voluntary bankruptcy petitions on January 15, 2015 also triggered the automatic stay pursuant to 11 U.S.C. § 362(a).

35. The NRF's February 13, 2015 Interim Payment Demand, though addressed to non-debtor entities, violated the automatic stay by seeking to (a) demand an interim payment and (b) bind CEOC and its debtor subsidiaries to a statutory arbitration procedure that would substantially affect the Plaintiff Debtors' assets.

36. Because notice and demand of payment of withdrawal liability to one member of a Controlled Group is notice to all members of the Controlled Group, the February 13, 2015 notice to CEC and CERP constituted notice to Plaintiffs in the Controlled Group. See Trustees v. Central Transport, Inc., 888 F.2d 1161, 1163 (7th Cir. 1989).

37. The withdrawal liability payment demand represents an improper attempt to recover against the debtor Plaintiffs' assets by ostensibly seeking payment from non-debtor entities in the Caesars Controlled Group which, for purposes of liability under ERISA and the MPPAA, constitute a single indivisible entity.

38. Further, because Plaintiffs remain liable for any payments owed by the Controlled Group, any notice or demand for payment inexorably affects the debtor Plaintiffs' assets by initiating a process in which the Caesars Controlled Group entities may be responsible for interim withdrawal payments or waive the right to challenge the legitimacy of the Expulsion and withdrawal from the NRF.

39. Creditors are barred from demanding payment from a bankrupt debtor by the automatic stay. 11 USC § 362(a).

40. The Seventh Circuit has suggested in prior dicta that notices regarding payment of withdrawal liability under ERISA and the MPPAA may be an exception to the rule that creditors

are barred from demanding payment from a bankrupt debtor by the automatic stay. <u>Central States v. Slotky</u>, 956 F.2d 1369, 1376 (7th Cir. 1992). However, the circumstances of the case giving rise to that <u>obiter dictum</u> differ substantially from the situation here.

41. Unlike the pension plan in <u>Slotky</u>, the NRF is not facing a complete voluntary withdrawal of an employer who, following insolvency, rejects the CBAs to which it is a party and disavows any further payments required thereunder. In <u>Slotky</u>, the pension fund would have foregone entirely the ability to receive payment had it not sought payment from other members of the controlled group. In this case, none of the members of the Caesars Controlled Group have expressed an intention to withdraw from the NRF; indeed, all have continued to make regular payments to the NRF. Moreover, because the Caesars Controlled Group's withdrawal liability would decrease over time pursuant to certain amended MPPAA provisions, members of the Caesars Controlled Group have an incentive not to withdraw from the NRF.

42. Because the NRF's withdrawal liability payment demand is not based on a voluntary or intentional withdrawal from the NRF, the NRF's payment demand is precisely the type of payment demand against which the automatic stay seeks to protect. This is because it seeks payment from a bankrupt debtor outside of the normal claims procedures of the bankruptcy court by taking advantage of the joint and several liability and arbitration provisions of ERISA. This is a violation of the automatic stay created by the provisions of 11 U.S.C. § 362(a).

43. The NRF's payment demand is also invalid because the Expulsion giving rise to the liability was void as violating the automatic stay. (<u>See</u> *Debtors' Motion For Entry of an Order (I) Enforcing the Automatic Stay, (II) Voiding Actions Taken in Violation of the Automatic Stay, (III) For Contempt and Sanctions against the NRF and the NRF Trustees, and (IV) Granting Related Relief*, filed concurrently in the chapter 11 case.)

## Count II

**Declaratory Judgment — Payment Demand Does Not Apply to and Cannot Bind CEOC or Debtor Subsidiaries**

44. Plaintiffs repeat and incorporate the allegations contained in paragraphs 1–31 as though fully set forth herein.

45. Even if the Court finds that the interim payment demand letter is not void as to the non-Debtor affiliates to which it was addressed, the Plaintiffs seek a declaration that the demand does not and cannot bind the Plaintiff Debtors. The requested declaration is consistent with the the Seventh Circuit's ruling in Slotky, where the court noted that a demand to non-debtor affiliates could be construed as ineffective with regard to debtors protected by the automatic stay. Cent. States, Se. & Sw. Areas Pension Fund v. Slotky, 956 F.2d 1369, 1376 (7th Cir. 1992).

46. Therefore, even if the demand letter is not void as to the Plaintiffs' non-Debtor affiliates, the Court should declare that the Interim Payment Demand is of no legal effect as to the Plaintiffs, because to construe it otherwise would be to allow the Defendants to do indirectly (by virtue of the joint-and-several liability provisions of ERISA and the MPPAA) what they are forbidden to directly by section 11 U.S.C. § 362(a).

47. Here, the notice and demand for interim payments is not valid to the extent it purports to bind the Debtor Plaintiffs to either (a) making interim withdrawal payments; or (b) starting the clock to seek redress through ERISA's arbitration procedures.

48. If the Court determines that the automatic stay applies only to the Debtors, it should extend the automatic stay consistent with the relief requested in the *Debtors' Emergency Motion for Entry of an Order (A) Extending the Automatic Stay to Enjoin Certain Payments and Legal Processes and (B) Granting Related Relief*, filed concurrently herewith.

WHEREFORE, the Plaintiffs demand judgment against the Defendants and request the following relief

    a.    a declaratory judgment in the Plaintiffs' favor that the Defendants' demand of interim withdrawal payments is a violation of the automatic stay under 11 U.S.C. § 362 and is void.

    b.    a declaratory judgment that the Plaintiffs:

        i.    are not bound to make interim payments under 29 U.S.C. § 1399(c)(2)

        ii.    are not bound to the arbitration procedures of 29 U.S.C. § 1401(a)(1)

        iii.    will not have waived any rights nor waived the ability to challenge the NRF's Expulsion and calculation of withdrawal liability by not making interim payments that are stayed pursuant to 11 U.S.C. § 362

        iv.    will not be bound to the outcomes of any arbitrations or legal proceedings instituted by non-Debtor members of the Controlled Group.

    c.    such other, further or different relief as the Court deems just and proper.

Respectfully submitted,

March 6, 2015
Chicago, Illinois

| | |
|---|---|
| */s/ Stephen C. Hackney* | |
| James H.M. Sprayregen, P.C. | Paul M. Basta, P.C. |
| David R. Seligman, P.C. | Nicole L. Greenblatt |
| Stephen C. Hackney | **KIRKLAND & ELLIS LLP** |
| **KIRKLAND & ELLIS LLP** | **KIRKLAND & ELLIS INT'L LLP** |
| **KIRKLAND & ELLIS INT'L LLP** | 601 Lexington Avenue |
| 300 North LaSalle | New York, New York 10022-4611 |
| Chicago, Illinois 60654 | Telephone:   (212) 446-4800 |
| Telephone:   (312) 862-2000 | Facsimile:   (212) 446-4900 |
| Facsimile:   (312) 862-2200 | |

*Proposed Counsel to the Debtors and Debtors in Possession*